UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | No. 09-CR-60-ART |
| | ) | |
| v. | ) | |
| | ) | RECOMMENDED DISPOSITION |
| CAMERON GOETTING and | ) | |
| JOSEPH WALTON | ) | |
| | ) | |
| Defendants. | ) | |

*** *** *** ***

The Court addresses a motion to suppress filed by Defendant Cameron Goetting. *See* DE #23 (Motion to Suppress). Defendant Joseph Walton[1] seeks to join that motion. *See* DE #38 (Motion to Join). The Court conducted a lengthy evidentiary hearing in the matter, *see* DE #33 (Transcript) (hereinafter "Tr."), and received extensive post-hearing briefing. *See* DE ##45 (Goetting Brief); 47 (U.S. Response); 48 (Goetting Reply). Walton also separately briefed the issue. *See* DE #44 (Walton Brief); 46 (U.S. Response to Walton).

After careful consideration of all arguments, the record, and the evidence presented, the Court determines that, on May 6, 2009, police lawfully stopped and detained Goetting under *Terry v. Ohio*, 88 S. Ct. 1868 (1968). Further, police timely (indeed, almost immediately) swept the exterior of Goetting's vehicle with a certified and reliable drug dog, yielding probable cause to search that vehicle and (via the resulting crystal methamphetamine found) to arrest Goetting. At all

---

[1] Despite being directed to address whether he sought a separate hearing, *see* DE #41 (Order), Walton did not respond on that matter or ask for his own evidentiary hearing. Walton also was not present for Goetting's hearing, though he joins in Goetting's arguments from that hearing. The Court views as waived any argument by Walton that would rely on facts **not** encompassed by the Goetting hearing because Walton neither argued for nor sought a separate evidentiary hearing. The Court **GRANTS** DE #38, but only to the extent Walton seeks to join Goetting's specific arguments.

relevant times, authorities acted reasonably, as defined by the Supreme Court; thus, the District Judge should DENY Defendant's motion to suppress in its entirety. To the extent Walton has standing to make any duplicated arguments, the District Judge likewise should DENY as to Walton.

**I. Background and Hearing**

Goetting and Walton face a two-count federal indictment, centered on an alleged conspiracy to distribute 50+ grams of methamphetamine, in Whitley County, Kentucky, on May 6, 2009. *See* DE #1 Indictment (Count 1). The Indictment also contains a forfeiture count. *See id.* The instant motion focuses on whether police validly seized Goetting, who was in his car at Burger King in Williamsburg, Kentucky, the morning of May 6. Goetting (along with Walton) alleges that police did not have requisite cause at the time and seeks to suppress the quantity of crystal methamphetamine the police ultimately found in Goetting's vehicle.[2]

At the hearing, the United States presented testimony from Kentucky State Police (KSP) Detective David Lassiter and from KSP Trooper (and K-9 handler) Jason McCowan. The defense cross-examined each but did not present separate witnesses.

The Court relates the following testimony of significance:

-- Lassiter is an experienced KSP detective, with approximately 5 years devoted to drug interdiction. *See* DE #33 (Tr). at 4-5. Working through a new confidential informant (CI), *see id.* at 30, Lassiter tried to arrange a three ounce crystal meth purchase to occur in Williamsburg early on May 6, 2009. *See id.* at 6-9. The CI had an out-of-state source – known only to the CI as "Joe" – that was unable to obtain

---

[2] The Government has the burden of justifying a warrantless seizure and search. *See United States v. Herndon*, 501 F.3d 683, 692 (6th Cir. 2007).

--  the drugs independently; Joe arranged to bring a seller with him to Kentucky. Lassiter monitored the calls setting up the deal and discussing the transaction through the night before and early morning of May 6.  *See id.*

--  The state of origin received much attention at the hearing.  Lassiter gave a somewhat uneven report on that topic, describing connections both to South Carolina and to Georgia.  The versions varied: DE #33 (Tr.) at 8-9 ("Q: Where was [sic] Joe and the accomplice coming from? A: South Carolina/Georgia border. . . . The CI gave me that information."); *id.* at 27 (agreeing that "nothing" in case report mentioned "South Carolina/Georgia border"); *id.* at 79 (describing CI's relationship with Joe as deriving from when "CI was living in Georgia" and that Joe had "some ties with some people in Savannah"); *id.* 86 ("He [the CI] indicated that he knew a guy named Joe in Georgia that could get him drugs and have it delivered up here."); *id.* at 98-100 (relating history concerning Georgia but describing Joe, at time of May 5-6 events, as being in "North Augusta, South Carolina"); *id.* at 96 (agreeing "That's [*i.e.*, the drugs were coming from Georgia] what the CI said.");  *id.* at 104 (affirming a perceived "tie" between "Joe, the drugs, and Georgia"); *id.* ("He originally told me that the drugs would be coming from Georgia."); *id.* at 80 (explaining that "[t]he discrepancy [between states] came when Joe couldn't – nobody would give Joe the drugs to carry up here without Joe first paying for it.  Then you get something different.").  Lassiter stated his expectation that the seller(s) would arrive in a car either from Georgia or South Carolina.  *See id.* at 62.

--  Lassiter set up a waiting buy/bust operation, but the seller(s) acted very cautiously.

3

      During the night, over repeated calls, the seller(s) refused to divulge their location, precise expected arrival time, or mode of transportation. Lassiter viewed this as counter-surveillance and deemed the seller(s) sophisticated. *See id.* at 11. On one call, Lassiter was able to overhear another male speaking, *see id.* at 87, and Lassiter thus knew that Joe would not be alone. *See id.* at 6 (Lassiter stating Joe indicated on call he would be "bringing his man with him" along with three ounces of crystal meth). The monitored calls did corroborate the CI's relationship with Joe as Joe accompanied the drugs north.

-- The seller(s)' refusal to specify an arrival time nearly ruined the operation. After many hours, Lassiter had determined that the seller(s) were not coming and aborted the operation; the CI then called to say that Joe had arrived in Williamsburg. This prompted Lassiter immediately to restart the plan, gather his officers in a hidden location near Wal-Mart, and begin an effort to locate the CI. *See id.* at 10-11.

-- Authorities then found the CI driving around Williamsburg. *See id.* at 31. "Joe" was in the car, matching the CI's prior physical description. *See id.* at 29. Police, including Lassiter himself for a time, surveilled Joe and the CI as they drove around Williamsburg. Joe was separate from his reputed seller and in the CI's vehicle. At one point, the CI furtively called Lassiter and left the phone "on" so that Lassiter could hear the conversation. He picked up snippets, including a reference by one of the persons to "Burger King." *See id.* at 14. A Burger King was located at the same I-75 exit where the parties rendezvoused; that exit also featured the Wal-Mart (where police hid) and a Days Inn (where the CI got a room). Ultimately, Lassiter lost

      visual contact with the CI and Joe, but the CI later called to report that he and Joe had come back to the Days Inn and separated. The CI was inside, alone in his room, and Lassiter directed him to remain there and not go back outside. *See id.* at 14-16.

--     Later,[3] another officer spotted Joe leaving the area of the Burger King. Joe was moving from the Burger King area toward the Days Inn parking lot. This officer had earlier seen "Joe" with the CI in an adjacent gas station lot, so he knew Joe's appearance. The officer radioed Lassiter about Joe's location, and Lassiter headed toward the Burger King parking lot. *See id.* at 16. Exhibits and testimony established that the Burger King is directly across Ky. 92 from the (former) Days Inn. The parking lots are only 40-50 yards apart. *See id.* at 95; *see also* Defense Exhibit #6 (photo from Burger King lot to Days Inn lot). The Days Inn lot is clearly visible from the Burger King lot.

--     Lassiter arrived at the Burger King lot in an unmarked vehicle. He was in the lot for 2-3 minutes. During that period, Lassiter noticed only one occupied vehicle in the lot. In the vehicle, which had Georgia tags, was a single male who was parked facing the building but was looking due left toward the Days Inn lot from the Burger King lot. The vehicle was running, the driver had his foot on the brake, and the car apparently was in gear. *See id.* at 17-19; 51; 83-84 (describing car as in gear and running). Lassiter described the man (who ended up being Goetting) as focusing on Joe in the Days Inn lot: "He was looking towards the Days Inn where Walton was."

---

[3] The precise time line is not clear. The sellers arrived in town around 8:15 a.m., and police seized Goetting at around 10:39 a.m. *See id.* at 44. The surveillance occurred during that interim period.

>*See id.* at 17; *id.* at 55-56 (Lassiter agreeing that he could not "testify to what his [Goettings's] perception was); *id.* at 89 ("He was locked in on that Days Inn. He was just – you know, he was just right on it. So much so that he didn't see my tan Charger. He didn't notice that, I don't think, in the parking lot."). Lassiter described Goetting as "focused in on the area [120 to 150 feet away] where Joe was." *See id.* at 95.

-- The detective suspected Goetting as the seller. However, he sought additional confirmatory information. From his position just behind Goetting's car, Lassiter could see both Joe and Goetting, and Lassiter then directed other officers to apprehend Joe in the Days Inn lot. Police, driving a tinted Chevy Tahoe, immediately sped up to intercept Joe in the lot. Several officers emerged and took Joe to the ground in a very public apprehension. Trooper McCowan agreed that the Tahoe he used was "clearly" a police vehicle; he also described at least three uniformed officers as exiting his Tahoe to arrest Joe in the Days Inn lot. *See id.* at 112, 136.

-- Lassiter watched Goetting for a reaction; as soon as the "take down" of Joe occurred, Goetting began to back out of the parking space. Lassiter then effected a stop of Goetting–he blocked Goetting's vehicle. Lassiter and another officer then removed Goetting from his car at gun point, frisked him, and placed him in the back of a city cruiser. Lassiter perceived Goetting's action as "[a]n attempt to leave the area." *See id.* at 19. Because of the detective's cognizance of the underlying meth deal and a perception of possible firearm presence, Lassiter determined to seize Goetting in the

forceful manner employed. *See id.* at 19-20; *id.* at 91-92 (noting flight and danger concerns).

-- Lassiter did not immediately begin to search the vehicle. *See id.* at 21. Rather, he radioed for the two K-9 units on the scene to come and sweep the car. The units were located just across the street; indeed, one of them (McCowan's) had been involved in the take down of Joe. *See id.* at 22. They arrived within moments of the stop–Lassiter put the maximum time between his stop of Goetting and K-9 arrival at ten minutes. *See id.*

-- KSP Trooper McCowan screened the Goetting vehicle via his dog, Rex Bax. Trooper McCowan is an experienced K-9 handler. He and his dog have completed all required training and certifications. *See id.* at 109. Rex Bax has been in service since 2001, and McCowan, after providing detailed descriptions, vouched for Rex's certification status and reliability. *See id.* at 133-35.

-- McCowan provided his recollections of the May 5-6 events. He was not involved in the investigation but did "take down" Joe as directed. After the arrest of Joe, McCowan immediately went to the Burger King lot across the street and swept the exterior of Goetting's car. Rex positively alerted within "moments," *i.e.*, within "two to five minutes" of Rex and McCowan arriving in the lot. The positive alert occurred most strongly on the passenger side of the vehicle; acting on the alert, police found meth in the passenger floorboard and then in a "smart box" under the car. *See id.* at 117.

Lassiter agreed that when he stopped Goetting, he did not have probable cause to effect an

arrest. *See id.* at 70. However, the Government contends that Lassiter properly stopped and briefly detained Goetting in accordance with *Terry* principles. The Court agrees.

## II. *Terry* Analysis

*Terry* endorses the constitutionality of an investigatory seizure on justification lower than probable cause. Such a stop is permissible when law enforcement has "'a particularized and objective' suspicion that criminal activity is afoot." *See United States v. Urrieta*, 520 F.3d 569, 573 (6th Cir. 2008) (quoting *United States v. Cortez*, 101 S. Ct. 690, 695 (1981)); *see id.* (requiring "'specific and articulable facts, which taken together with rational inferences from those facts,' reasonably suggest that criminal activity has occurred or is imminent") (quoting *Terry*, 88 S. Ct. at 1880).

As with most Fourth Amendment reasonableness analysis, the assessment is not formulaic and requires evaluation of the "totality of the circumstances." *See United States v. Arvizu*, 122 S. Ct. 744, 750-51 (2002). Officers can "draw on their own experience and specialized training" to make suitable inferences, *see id.*, and the proof "need not rise to the level required for probable cause, and . . . falls considerably short of satisfying a preponderance of the evidence." *See id.* (quoting *United States v. Sokolow*, 109 S. Ct. 1581, 1585 (1989). An officer's "hunch" or "gut" is inadequate, but "[a]ll that is required to justify a *Terry*-level search or seizure is 'some minimal level of objective justification.'" *See United States v. Brown*, 310 F. App'x. 776, 779 (6th Cir. 2009) (quoting *INS v. Delgado*, 104 S. Ct. 1758, 1763 (1984)).

The intensity and duration of the *Terry* stop must match its underlying justification. Thus, a stop that exceeds the justifying reason, employs more than necessary force, or takes more time than is reasonable becomes an arrest. *See, e.g., Smoak v. Hall*, 460 F.3d 768, 780-81 (6th Cir. 2006)

(citing, as factors, "the length of the detention, the manner in which it is conducted, and the degree of force used"); *Houston v. Clark County Sheriff Deputy John Does 1-5*, 174 F.3d 809, 814-15 (6th Cir. 1999) ("An investigative *Terry* stop may indeed ripen into an arrest through the passage of time or the use of force. . . . When this occurs, the continued detention of suspects must be based upon probable cause."); *United States v. Garcia*, 496 F.3d 495, 504 (6th Cir. 2007) ("The scope of activities conducted during an investigatory stop 'must reasonably be related to the circumstances that initially justified the stop.'") (citation omitted).

Here, the Court finds that Lassiter possessed an adequate basis for a *Terry* stop, and the stop remained within lawful pre-arrest parameters. At the time Lassiter determined to stop Goetting, he had a reasonable basis for believing the following:

- -- Joe had ferried drugs from Georgia or South Carolina to Williamsburg. The phone calls, along with Joe's arrival, corroborate the deal arranged by the CI (and audited by Lassiter) for three ounces of crystal meth.

- -- A male had accompanied Joe to Williamsburg. The calls show that Joe had a male with him, and the difficulty arranging the deal meant that Joe had to bring the seller along to complete the transaction. Joe had separated from that male and the transporting vehicle, because Joe had traveled around Williamsburg in the CI's car.

- -- Joe's accomplice was likely in the immediate area. Joe had been with the CI but had separated from him again at the Days Inn. It would be logical to think that Joe's accomplice would not be far from the scene.

- -- During Joe and the CI's tour around town, someone in the car mentioned "Burger King." Lassiter did not know whether Joe or the CI mentioned Burger King, but

    someone did, and Lassiter said this was the first concrete place that either mentioned on the monitored call.

--    At some point after the CI, then alone, called Lassiter from the Days Inn, Officer Freeman observed Joe walking from the area of the Burger King back toward the Days Inn. This modifies in part the earlier reference to Burger King and contributes to a rational view that Joe mentioned the restaurant. Further, Joe was coming from the area of the Burger King lot, where Lassiter then encountered Goetting. Joe had already been at the Days Inn with the CI, and he appeared to be returning to the Days Inn, or at least to the motel lot.

--    The Days Inn (where the CI remained) was visible from the Burger King lot. Joe's approach to the Days Inn also was visible from that lot. The distance between the two locations was less than the width of a football field.[4] It is logical to think that a seller using sophisticated counter surveillance – which Lassiter observed – would locate in a position where he could keep tabs on both the CI and on Joe.

--    In the lot, Lassiter spotted only one occupied vehicle. That car was licensed in Georgia. Lassiter's testimony was imperfect on the state-of-origin issue, but he did have a valid basis for linking Joe to Georgia. The reported departure point for the specific trip on May 5 may have been North Augusta, South Carolina, but the CI knew Joe from Georgia, and Lassiter reasonably thought the drugs may have

---

[4] The parties squabble over how congested the exit area was at the time. Lassiter agreed that the area, at that time of day, would have been busy, and he agreed that the exit features multiple establishments in close proximity. *See* DE #33 (Tr). at 41. However, he also testified that the Burger King lot was not busy and that Goetting's was the only occupied vehicle. *See id.* at 65.

originated from Georgia. Joe's difficulty in securing the drugs led to a departure from South Carolina, but the CI knew Joe as a Georgia source. Thus, Lassiter anticipating or being sensitive to a Georgia or South Carolina car was reasonable under the circumstances.

-- Goetting was in the car alone, with the vehicle running, his foot on the brake, and the car in gear. Sitting in a restaurant parking lot is not suspicious, but sitting in a lot with the motor on and the car in gear for 2-3 minutes is, in this context, noteworthy conduct. Critically, Goetting's attention also contributed to Lassiter's perception. Lassiter described Goetting as focused on the Days Inn lot. Goetting's car faced the Burger King building, but he noticeably was looking directly left, toward the Days Inn. During the period of surveillance at Burger King, Goetting was looking toward the Days Inn lot, where Joe walked. The CI also was still at the Days Inn, though inside. Lassiter reasonably segregated Goetting based on the items and behavior observed.

-- Finally, Lassiter did not hastily act to seize Goetting at that moment. Rather, he orchestrated a test to confirm Goetting's interest in Joe and the Days Inn location. While watching Goetting, Lassiter directed the take down of Joe by an obvious show of police force. Goetting immediately reacted by beginning to leave the Burger King. This reaction confirmed reasonably to Lassiter that Goetting had been watching Joe, saw the arrest, and intended to flee the area. Unprovoked flight is an established pro-stop *Terry* factor. *See Illinois v. Wardlow*, 120 S. Ct. 673, 676 (2000).

The Court finds that, based on the totality of the circumstances, Lassiter's basis for the stop was valid under *Terry*. He acted on specific and articulable facts, drew rational inferences from those facts, and had a reasonable basis for suspicion of criminality.[5] The officer observed Goetting and made "commonsense judgments and inferences about human behavior." *See id.* The judgments made and inferences drawn were reasonable and constitutional. Goetting's conduct could all have been innocent, but *Terry* "accepts the risk that officers may stop innocent people." *See id.* at 677. The factors Lassiter considered, taken together, gave rise to a reasonable suspicion that Goetting was part of the meth deal, satisfying *Terry*.

Further, Lassiter acted reasonably with respect to the force and duration involved in the stop. The experienced detective perceived Goetting, a person suspected of involvement in a three ounce crystal meth deal, as potentially armed and dangerous. Particularly, Lassiter had concern over the levels of counter-surveillance encountered and the belief that Joe and his accomplice had a poorly established relationship with the CI. *See* DE #33 (Tr.) at 19-20. Lassiter's experience-based concern was reasonable. *See United States v. Heath*, 259 F.3d 522, 530 (6th Cir. 2001) (noting that officers may "rely on their experience and training in concluding that weapons are frequently used in drug transactions" when determining the degree of necessary force to detain a suspected trafficker during a *Terry* stop). Lassiter also rationally feared that Goetting would continue an effort to leave the scene. As such, blocking the vehicle in the lot and forcing Goetting from the vehicle at gunpoint was reasonable. An officer with a reasonable fear for safety, or the presence of weapons, can take

---

[5] Lassiter's credibility impressed the Court. He admitted weaknesses where they existed and did not overplay his testimony. Further, he showed restraint throughout the surveillance and take down, indicating an officer intent on proceeding cautiously and lawfully. He was a witness that testified candidly to both the strengths and flaws in the case.

appropriate steps to guard against the perceived danger. *See Heath*, 259 F.3d at 530 ("This Circuit permits the use of force, such as handcuffs and guns, to effect a stop when such a show of force is reasonable under the circumstances of the stop."); *Houston*, 174 F.3d at 814-15 (permitting steps "'reasonably necessary for the protection of the officers'") (citation omitted); *id.* at 815 (permitting officers to draw weapons and detain in a cruiser, if justified); *id.* (permitting use of handcuffs if warranted by circumstances). Because Lassiter had a reasonable belief that Goetting may have been involved in the meth deal, he also had a reasonable basis – on these facts – to employ force and to sequester Goetting during the seizure and drug sweep. A high-quantity crystal meth transaction between remote traffickers with little prior relationship presents, as Lassiter opined, a reasonable basis for concerns about possible firearms and violence. Lassiter acted reasonably and within *Terry*'s proper boundaries.

### III. Conclusion

For these reasons, the Court finds that Lassiter's stop and detention of Goetting complied fully with *Terry*. The immediate dog alert[6] led properly to a vehicle search and timely probable

---

[6]

Goetting does not complain over the interval between seizure and the dog's sweep. Indeed, the sweep occurred mere minutes after the stop at Burger King. A delay of less than ten minutes to effect a dog sweep, in this context, surely amounts to a reasonable *Terry* detention. *See, e.g., United States v. Garcia*, 496 F.3d 495, 504 (6th Cir. 2007) (endorsing as *Terry*-compliant a canine sniff "within a half hour of the stop"); *United States v. Johnson*, 267 F. App'x. 412, 415 (6th Cir. 2008) (finding "that a forty-three minute traffic stop is a reasonable period of time to allow police to contact a canine unit, wait for its arrival, and have a dog check for the presence of narcotics").

Goetting also does not criticize the dog's positive alert or the resulting probable cause. The evidence establishes that Rex Bax was certified and reliable. In this Circuit, "A positive indication by a properly-trained dog is sufficient to establish probable cause for the presence of a controlled substance." *See United States v. Diaz*, 25 F.3d 392, 393-94 (6th Cir. 1994); *United States v. Torres-Ramos*, 536 F.3d 542, 554 (6th Cir. 2008) (citing *Diaz* and premising probable cause on alert from dog for which "'the training and credibility . . . must be established'").

Here, the qualified dog promptly alerted. That alert provided probable cause to search, and the resulting crystal meth provided probable cause to arrest Goetting.

cause for arrest. The Court recommends that the District Judge DENY Goetting's motion. Further, Walton's motion depends entirely on arguments made by the Co-Defendant, and the Court should likewise DENY Waltson's motion.[7]

The Court directs the parties to 28 U.S.C. § 636(b)(1) for appeal rights concerning this recommendation, issued under subsection (B) of that statute. As defined by § 636(b)(1) and Federal Rule of Criminal Procedure 59(b), within fourteen days after being served with a copy of this recommended decision, any party may serve and file written objections to any or all portions for de novo consideration by the District Court. The parties should consult the aforementioned statute and rule for specific appeal rights and mechanics. Failure to object in accordance with Rule 59(b) waives a party's right to review.

This the 2nd day of February, 2010.



Signed By:
Robert E. Wier  REW
United States Magistrate Judge

---

[7] Walton, well removed from the stop scene, has no standing to contest Lassiter's seizure of the car. Further, no search occurred until after the dog's exterior alert provided probable cause. *See Illinois v. Caballes*, 125 S. Ct. 834, 837-38 (2005); *United States v. Perez*, 440 F.3d 363, 375 (6th Cir. 2006). Thus, even if Walton somehow established a privacy interest in the contents of the vehicle, which he did not by evidence before the Court, the result still would be a valid search. Again, Walton did not seek a hearing on the basis for his arrest, and the Court thus does not separately analyze that issue. Suffice to say, however, that justification for the take down of Joe obviously exceeds in strength the evidence held sufficient to detain Goetting.